The next case called for oral argument is in Re the Marriage of Fromm. Court pleases, counsel. My name is Larry Sloss and I, along with Abby McAdow, represent the petitioner Jerry Fromm in this action. This is an appeal of the courts of Maryland. Judgment of the remaining issues which divided marital assets and marital debts. As our position of the trial court in its decisional judgment, there are three issues in which are aired. The first issue is with regard to the party's joint tax liability for the years 1995 through 2001, which the court found that to be a result of Jerry Fromm's dissipation of marital assets. The second issue is the trial court erred in not finding that Brenda, the wife, dissipated marital assets. But after the marriage broke down, she then took money from a 401k plan, marital assets, and purchased a separate home for herself. The third issue is that the court erred in not properly allocating the marital asset, namely a 401k and pension plan, to the wife as far as her employment with Toyota. For the court to understand, I believe a brief back to chronology will be helpful. The parties in this case were married in July of 1989. They separated in July of 2006. There was a bifurcated ground series held in May of 2007. But looking at the record as a whole, I believe that during their 17-year marriage, the court will see that Jerry and Brenda lived basically beyond their means and lived a very comfortable lifestyle. During the marriage, Jerry was employed as an insurance agent. His earnings were used primarily, the majority of his earnings, were used for the family's needs. The family consisted of Jerry, Brenda. Brenda's daughter, by her previous marriage, Jerry adopted at a young age. That was the family union. His income was for their housing, their food, their vehicles, their clothing, necessities of life, as well as entertainment, travel, and any incidental expenses. During much of their marriage, Brenda's employment was in a lesser-paying position. From 1989 to 1991, she worked as a florist. From 1992 to February of 2003, she worked part-time as a gymnastics instructor. The evidence before the court showed that in the latter part of working as a gymnastics instructor, she was making between $13,000 and $15,000 a year. This period of time is relevant, and that is the period of time when the IRS debt was incurred. During the period from 1995 to 2001, the parties incurred a rather large income tax liability. In fact, the income tax liability was the single largest debt that Jerry and Brenda had at the time of their dissolution. That debt was incurred as Jerry, being an insurance agent, does not receive a W-2 nor withholding. During the course of the year, the money that he would receive was being expended on various expenses within the family. Jerry, Brenda, the daughter, all had use of that money during this period of time. He didn't pay us much quarterly taxes. As the court will see, that when it comes time to pay the tax the following year, they simply did not have income to pay the taxes. Taxes went unpaid. At the time of fraud, the amount of the income tax liability with penalty and interest was $137,000. That was incurred from 1995 to 2001. In 2003, Brenda's employment situation changed significantly at that point in time. She went to work for Toyota Manufacturing, which is an automobile manufacturer, and began earning in excess of $50,000 a year. She also had benefits with that job, including a 401k and pension plan. From the time she commenced that employment, she was able to make significant contributions to her 401k. This was possible because Jerry continued to pay the majority of the household and family expenses. At the time the ground string was held, Brenda's 401k had in excess of $47,000 in it. The pension plan had in excess of $17,000. And that was after the time she had withdrawn $20,000 to pay as a down payment on separate residence when she moved from her marital residence. At trial, counsel for Brenda argued that the breakdown of marriage occurred in October of 2003. Admittedly, in October of 2003, Jerry had an extramarital affair. The evidence presented at trial establishes that affair lasted a short period of time, approximately 30 days, and there were no significant marital assets expended during that time. The court's order, I think, misconstrued or misinterpreted the evidence, because there was evidence that after this ground string, he then established a relationship, and that continued up to the period of remaining issues. That has no bearing on this other than the court found, as part of the dissipation, a two-and-a-half-year extramarital affair. That simply did not happen. In fact, Brenda, after the ground string, remarried herself. But we believe the court has misinterpreted the evidence in its decision. I guess it wasn't a ground string. The court entered a judgment of dissolution of marriage at the ground string. Otherwise, nobody would be getting remarried. I refer to this ground string as a judgment, but he misconstrued the evidence before the court. The evidence was that the party separated back in October of 2003 for about two months. Then they reconciled. They moved back in. They attended marriage counseling and continued to live together for an additional three years. Do you think that in order to find this breakdown, you have to have a date certain? Your Honor, I don't believe it has to be a date certain, but I think there has to be a period of time. I mean, I don't believe that we can say that happened January 1 or July 1, but there is a period of time. Clearly, I don't believe that period of time was a three-year period. It was a breakdown, or it was a reconciliation. Did the court in any way indicate, because it did in its written judgment, that the court found that there was an irreconcilable breakdown back to 1995 through 2001? No, Your Honor. And the evidence, the weight of the evidence is clearly against that. I mean, they were living as a family. There was no breakdown, any discord at all in the marriage, at least until October of 2003. There were some generalized statements that we led separate lives and things of that nature, but as far as any finding of any marital discord, there was certainly no marital discord during that period of time before October of 2003. At the time of separation, when Brenda left the marital residence, she then purchased a home in Evansville, Indiana, took $20,000 out of her 401k, took another $8,000 of marital assets, and financed the remainder of the purchase. She also took the bulk of the personal property. The personal property which she took was essentially all the tangible personal property they acquired. Each party had a car that had some small amount of debt on it, and Jerry had a few rudimentary sort of living furniture so that he could continue on. Would you agree that even if the court didn't find an irreconcilable breakdown between 1995 and 2001 when that tax liability occurred, that the trial court could have said, because he was the principal wage earner and didn't pay the taxes, I'm going to assess that to him, irrespective of whether the marriage was broken down? The court could, but in current financial circumstances, it was more of a situation of parity at the time the marriage broke down. Their incomes were not that drastically different as of that date. As far as the court's finding, the court found that it was the result of dissipation, and as the court's aware, dissipation has a very defined meaning under Illinois law. The O'Neill case that we cite in our brief, which is a Supreme Court case from 1990, sets out the elements that are required to find dissipation. It says that that's the use of a marital asset for the sole benefit of one's spouse, for a purpose unrelated to the marriage at a time the marriage is undergoing an irreconcilable breakdown. First, the use of the funds, which we're talking about, is income that was earned during the marriage, so it was not used for his sole benefit. And secondly, it was certainly not at a time the marriage was undergoing an irreconcilable breakdown. The court, in its decision, references allegations that Jerry had gambled throughout the marriage. Gambling prior to the breakdown would not be a dissipation of marital assets because It would be contributing to the reduction in the value of the marital estate, which is something the court certainly could consider. That's correct, but it would not be a dissipation as the court determined to be a dissipation. Similarly, the court said that there was a loss of income due to his suspension of his insurance license because of indiscretions that Jerry made. Again, the loss of income occurring in 1998 is not a dissipation when the breakdown, according to the evidence, could not have occurred prior to 2003. And we believe the Dunstop case, which talks about the assignment of the tax liability, focuses on this. To accept the court's dissipation, essentially any dissipation, any expenditure that a spouse would make during the court's marriage would be subject to a claim of dissipation unless you have that caveat that it's during an irreconcilable breakdown. Clearly, we believe that the expenditure which Brenda made in July of 2006 would have to be classified as a dissipation. The court found that not to be a dissipation. At that point in time, the evidence was she took $20,000 from a 401k fund to put down the house, along with $8,000 of joint marital assets. The court found that was not a dissipation. Clearly, at that time, the marriage was breaking down. It was for her sole benefit. $20,000 was not a normal living expense. It's not paying rent for the period until the judgment center, or it's not for clothing. There was no evidence of that being for necessities. The last thing that I would like to mention is with regard to ‑‑ Okay, let me ask a question about that claim that that was dissipation by the wife. That money was not gone. It was in the house she bought. Okay? And didn't the judge treat it as marital property and awarded it to her? He did. In other words, she took the money, put it in real estate. It was still marital property. It wasn't gone. The judge said, you get it. Why can't he do that? Well, in terms of looking at the overall context of the picture, essentially the trial court awarded essentially all the marital assets to Brenda and essentially all the marital debt to Jerry. Well, I mean, yeah, and I understand you may disagree with how marital property is divided, but I mean on your dissipation argument. How is it dissipation if the money is not gone? It's one thing you take $20,000 and put it on rent at the casino and lose it, and then the court says, you know, we're going to take another $20,000 off what you would have got because you blew this money. But here she's still got the real estate. It's still there to be divided. I understand, and I agree with your position that the asset was still there. There was no allocation made of that asset and no financial dissipation. Okay, so the judge never said you get this real estate. Well, the real estate was awarded to her, but there was no allocation made for the $20,000 to $28,000 in the overall context. So it's our position in the overall context, if you look at the overall context, that it's an abuse of discretion because all the debt was awarded essentially 100 percent to the husband, and the wife received all the assets. With regard to the 401K plan, which there was no allocation made. In fact, the order was sided as the 401K plan. This was the single largest unencumbered asset the parties had. There was no allocation made of it, and it's our position there should be an equitable division or allocation of that asset. We would ask that the court reverse the trial court. We would ask that it enter judgment according to the evidence, equitably dividing the tax liability, allocating for the $20,000 that was found not to be a dissipation, and also that equitably divide the pension plan for the 401K, which is in excess of $64,000. Or alternatively, we would ask the manager to reconstruct them. Thank you, counsel. Counsel? I'm sorry, counsel? Good morning. May it please the court? Counsel? My name is William Hudson of the Law Offices of Wisconsin-Hudson, here representing Brenda L. Fromm, now known as Brenda L. Gowacki, the appellee in this case. We are asking the court to affirm the trial court's findings that Jerry did dissipate assets, that Brenda did not dissipate assets, and that the trial court did not abuse its discretion when it made the final distribution of marital assets and debts, including the pension plan and 401K plan. The three issues that we have today, as raised by Jerry's brief, are to be treated differently in their standard of review. Under 503, under the Illinois Marriage and Dissolution of Marriage Act, there are 12 factors to determine the property and debt distribution. Those 12 factors are to be viewed by the court, and the factors have to have an evidentiary – they don't have to have an evidentiary finding, but the court may make a finding of each of those factors. However, all of those factors do have to be considered for the final distribution. The findings are evidentiary findings, and those are under the manifest weight of the evidence standard. What the court does in its final disposition, however, is under the abuse of discretion standard. I believe the current court, the second district case, sets forth the distinction between the findings and also the final distribution. I might also inform the court that the first district case, TOEF as cited, states that this court is not to substitute its own judgment or its own property distribution of that of the trial court when using an abuse of discretion standard. Don't you think the trial court has to find some time frame where the marriage is undergoing an irreconcilable breakdown in order to find dissipation or to apply the dissipation standard? I do, Your Honor, and actually the Holt House case, second district case, says that the court does not have to explicitly state the specific date of the date of the irreconcilable breakdown. But there were a couple other cases that have been cited, the Carter case and also the Goethe case. And in those cases, the Carter one, the parties had separated in 1992, and there was a first petition for dissolution of marriage filed. They reconciled, and then there was a second petition filed in 1998. The court in that case found that the parties actually began their irreconcilable breakdown back prior to 1992 to the first petition being filed. Likewise, in the Goethe case, the date of the breakdown that the court set was four years before the final petition was filed and a year before the first petition for dissolution of marriage was filed. And I think that in this case, there was evidence of the extramarital affair in 2003 by Jerry and that the parties did attempt a reconciliation. But I don't believe that they did reconcile, and I do believe that it was going through an irreconcilable breakdown that entire time. Let's talk about the 1995 to 2001 when the tax liability occurred. What was the irreconcilable differences in the marriage by the facts at that time? At one point in 1998, there was the insurance scheme, which counsel for Jerry mentioned. Jerry filed some fraudulent insurance claims on Brenda's car without her knowledge. The trial court found that she had no knowledge and had no partner. Did she separate from him during that time? Did they live separate and apart, sleep in separate bedrooms? I don't believe they did, although she did make some statements during trial that the parties did live separate lives much of their marriage. I think the trial court was in the best position to weigh her statements against Jerry's statements, and that was another finding that he made. He weighed the credibility of the witnesses, and he believed Brenda to be a more credible witness. In addition, the tax liability also fell. Even though the tax liability occurred from 1995 to 2001, its effects are still being felt today. It's not just a certain point in time where, as the court said earlier, that Jerry took some $20,000 and placed it on rent, and that was the end of it. There is still a tax lien from the IRS on the Sugar Creek property, which is a vacant lot. There's still an IRS tax lien on the home purchase in Evansville, Indiana, which makes that asset. It was upside down anyway because of the mortgage, but now because of that tax lien, Brenda's still feeling the effects of Jerry not paying and satisfying that tax debt. She has never gotten a tax return since that time that they've incurred the debt. Didn't she testify that she believed the marriage broke down in 2003? I believe she made that statement, and I believe she also made the statements that they did live separate lives previously throughout the marriage. And it's not the point of breakdown, it's the point of breaking them, and I think that that's a distinction that needs to be made. So what you're advocating is that for us to accept or find or whatever, that the marriage was irretrievably broken for about 11 years before they filed for divorce? Not irretrievably broken, but it was breaking down. Or in the process of? Yes, and as stated in the Carter case, that marriage was breaking down over six years, and the Gerda case over four years. I mean, I guess you could argue any marriage that ends up in divorce was breaking down over a long period of time. Yes, and I've seen a few of those, too. But in addition to the dissipation, I do believe that another factor that the court could have considered and obviously did consider was contribution. It's the first factor under 503D, and it states that the court is to consider not only increases in the assets but also decreases in the assets. And there doesn't have to be an irretrievable breakdown period for finding a negative contribution, which I think is what was going on here with Jerry. He was the one who had the ability to pay. His financial situation, he was the primary wage earner by far. He had the financial ability to pay. There was some dispute in the testimony. Jerry stated that the whole family benefited from the lavish lifestyle. Brenda, I believe, testified that she did not enjoy a lavish lifestyle such as Jerry testified to. And, again, that's a factual consideration and credibility of the witnesses that the trial court made. Talk to me about the 401K plan. And that was not specifically discussed in the trial court's final order, her 401K. You called it a bank account. I called it a bank account, and I believe it could be covered as a bank account. It's a bank account in her name. And I believe that the trial court made a thorough findings of fact, made a thorough disposition of the assets and debts, and that he did essentially award her her pension in a 401K plan. Was the 401K in a bank account? How was it held? I mean, a 401K could be a bank account, but was it in this case? I think it was an investment. I don't know for certain that it was in a bank or that it was not. And I don't know that. I think there were some exhibits of the statements of earnings that might reflect that. The division of Brenda's pension, in case the court does not accept that the trial court did make that division or that it was, as argued by Jerry, improper. I think that Jerry's treatment of the rules regarding pension plans sort of misstates the law and makes it sound as though the trial court must make a division of the pension in a 401K, when in fact that is not the case. The law originally started out that pension plans were usually in the name of one spouse. They were earned by that spouse. The other spouse couldn't contribute, so they were treated as essential non-marital property. There was a change in law, and they were specifically found to be marital property. It didn't make them a magical marital asset to where they get some special treatment, but it did state that pension plans are to be considered as marital property. I cited the pension code, which stated that the courts may order a division of the pension in 401K, but, again, they're not required to. Subject to equitable distribution like any other marital property. Yes, Your Honor. It would be the same thing as if Jerry and Brenda had a 2010 Corvette. It's a marital asset. It must be distributed, but you don't have to cut it down the middle. I believe also we've spoken about Brenda's dissipation or alleged dissipation. In the cases that are cited by Jerry, the Severson case and the Hank Sheenis case, first and second district case respectively, in those cases, the spouse that did have to move out of the marital residence, in the Severson first district case, $58,000 were considered to be reasonable living expenses to support the spouse that vacated the marital residence. In the Hank Sheenis case, the second district case, $65,000 was considered reasonable living expenses. What Brenda did was she took the money from the 401K as a down payment. It's still tied up in the marital asset. However, now, because of the mortgage, because of the tax lien on it, it's pretty much a worthless asset. But she did use it for the time that she separated from Jerry in 2006 to the time that the judgment on grounds was entered in 2007 as a residence for her living. And that $20,000 actually falls under the exception to the rule of dissipation that it is a reasonable living expense. The overall distribution, however, it was stated that Jerry got all of the debts. Brenda got all the assets. But there's one asset that has not been discussed in Jerry's brief or Brenda's brief, and that is Jerry's insurance business. Jerry's? Insurance business. At the end of trial, he was earning over $100,000 a year for the insurance business. At one time, he stated there was a high value of $135,000. Brenda was awarded no part of that insurance business. And there was some testimony in trial that her hours at the Toyota motor manufacturing plant had actually decreased and that her income had dropped from what it was previously. We saw that her 401K plan had dropped as a result of a financial crisis that the United States was hit with last year. So I don't believe that Jerry was left with no assets whatsoever and had to suffer with all the debt. But some of the other items of dissipation, the court found specifically four different ones, the tax liability, which, as I said, the effects are still being felt today by the tax liens, the possibility of even prison time for failing to satisfy that tax debt. He did testify that he gambled throughout, and even the last day of trial, he had stated that he had recently gambled. How that could not be a dissipation of assets is beyond me. We have the insurance scam, which he had to expend marital funds to get his license back. There was a loss of income during that period. What was that period of time when the legal insurance scheme was going on? The insurance scheme was in 1998. What was this period of suspension? I believe it was a six-month suspension. A six-month suspension when you're earning $100,000 a year hurts pretty badly, especially when Brenda was earning, I think at that time, between $10,000 and $13,000 a year. And then we have the extramarital affair and the resulting parentage action in 2003. I believe Jerry tried to argue that he made a successful case of defending that parentage suit, so there shouldn't be dissipation or a negative contribution. However, it was the affair itself and the resulting proof of the affair that caused the case to be filed, that caused attorney's fees to be incurred. And really, then, started the final period of breaking the ban. Thank you. Thank you, Counsel. Counsel? Thank you. I'll try to be brief. With regard to the tax liability and the current effects of tax liability, the current effects of tax liability affect both parties. It's our position that when the tax was incurred, the income was generated. That benefited both parties. In fact, there's testimony on record that there were tax money or money set aside to pay taxes one year, which financed the trip for Brenda and her daughter to gymnastics league in some distant state. So the effects are commensurate with the benefits that were received back at the time the tax liability was incurred. So I do not believe that the fact that the tax liability is still in effect carries much weight because the benefits were received by both parties at the time the income was incurred. With regard to the Severinsen case and counsel's argument that there's an exception to dissipation, the exception is if you can show it for necessary normal living expenses at the time of dissipation. The first summary has to be broken down. The Severinsen case is unique on its facts. In fact, it's distinguishable. If you look at the facts, the breakdown in that case was in 1981. The judgment wasn't until eight years later in 1989. The money which was used in that case, and the court was very specific, what the wife was able to establish her use of the funds during that breakdown, she presented canceled checks, credit card statements, received bills showing they were for expenses for rent, food, transportation, medical, the long period of time. And, you know, her day-to-day needs, and the ability to establish that was the exception. It wasn't an exception at all. That was because I was using that for a living expense. We would, again, ask the court to reverse the trial court and enter an appropriate judgment based on the facts and findings of the record. Thank you. We appreciate the briefs and arguments of counsel. We will take the matter under advice.